NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

———————————————

GIUSEPPE A. GAMBINO,                           :

                        Petitioner,            :            Civil Action No. 11-4221 (SDW)

                                               :

              v.                               :                   **O P I N I O N**

                                               :

WARDEN OF NEW JERSEY                            :
STATE PRISON,                                  :

                        Respondent.            :

———————————————

**WIGENTON**, District Judge:

        This matter comes before this Court upon Giuseppe A. Gambino's ("Petitioner")

application seeking a writ of habeas corpus, pursuant to 28 U.S.C. § 2254(a) ("Petition"), and

challenging his judgment of conviction entered by the Superior Court of New Jersey.  For the

reasons detailed below, the Petition will be **DENIED**, and no certificate of appealability will

issue.

## I.      BACKGROUND

### A.      The Events Underlying Petitioner's Conviction

        Addressing Petitioner's application for post-conviction relief ("PCR"), the Superior Court

of New Jersey, Appellate Division ("Appellate Division"), summarized the facts as follows:

> Petitioner was convicted of murdering his downstairs neighbor Richard Wighard.
> The killing appeared to be the culmination of a long standing dispute between
> [Petitioner], who rented an apartment upstairs, and the victim and his brother,
> John Wighard, who lived downstairs.  [Petitioner] contended that the brothers,
> who controlled the temperature for the building, kept his apartment too hot and
> that they were causing noxious fumes to enter his apartment.  On August 25,
> 2000, John Wighard was awakened by gun shots and found his brother lying on

the floor in their apartment.  The victim had gun shot wounds in his abdomen and
back.  John . . . immediately suspected [Petitioner] of the shooting, due to threats
[Petitioner] had previously made [and informed the police accordingly].  Matthew
Puzio, who was visiting a friend in the neighborhood, also heard the shots; he
heard someone say, "I had enough of this fuckin' shit"; and then he heard a car
drive away.  The victim had been shot with two .22 caliber bullets; the police
[came to Petitioner's apartment, but he was not there.  The police then searched
the apartment and] found .22 caliber ammunition and a gun holster . . . .  At trial,
[Petitioner's] business associate and friend George Imperatore testified that on the
evening [of the murder, Petitioner] said that he "couldn't take it anymore" and that
"I shot him[,] I shot him and then when he fell down I shot him in the back."
Imperatore understood [Petitioner] to be referring to his downstairs neighbor.
Imperatore then drove [Petitioner] to a bridge over the Hackensack River where
[Petitioner] threw away a gun.   The following morning [Petitioner] told
Imperatore that he had shot the victim and that he was glad he had done it.  Linda
Roll, a neighbor and friend of [Petitioner], received a telephone call from
[Petitioner] shortly after the shooting.  According to Roll, [Petitioner] told her that
he "could not take it any more" and that "I shot him."  She testified that prior to
the shooting, [Petitioner] had arguments with the Wighards.  [Petitioner] thought
the Wighards were trying to kill him with excessive heat and fumes, and
[Petitioner] said [to Roll] that he was going to shoot one of them.

State v. Gambino, 2009 WL 735836, at *1 (N.J. Super. Ct. App. Div. Mar. 23, 2009) (original

ellipses omitted); see also Docket Entry No. 14-15, at 2-3 (replicating the same decision).

#### B.   Petitioner's Trial

Petitioner testified at trial, maintaining that he had no involvement in Richard's murder.

He also insisted that he had no gun and, thus, could not dispose of any gun.  (Docket Entry No.

14-15, at 3.)  In addition, Petitioner stated that he had no idea how the .22 caliber ammunition,

found by the police in his apartment, could have gotten into the apartment, but he stressed that

the Wighards had keys to his residence, thus suggesting that the ammunition might have been

placed there by John.  See id.  He also contended that the gun holster the police found in his

apartment belonged to a certain federal marshal whom Petitioner knew.  See id.  After weighing

all the physical evidence and testimony presented at trial, the jury convicted Petitioner of first

degree murder and various gun-possession charges.  See id. at 4.  The trial judge sentenced him to thirty-five years of imprisonment, with thirty years of parole disqualifier.  See id.

### C.    Direct Appellate Proceedings

On direct appeal, Petitioner raised three claims, asserting that: (1) the jury charge given by his trial judge was "fatally flawed"; (2) "the trial judge erred in excluding the victim's criminal history"; and (3) Petitioner's sentence was excessive.  (Docket Entry No. 14-7, at 5.) The Appellate Division dismissed Petitioner's challenges and affirmed his conviction and sentence.  (See id. at 12.)  Petitioner failed to file a timely application for certification by the Supreme Court of New Jersey, but the New Jersey Supreme Court allowed said application nunc pro tunc.  (See Docket Entry No. 14-10.)  Addressing that untimely application on merits, the Supreme Court of New Jersey denied Petitioner's request for certification.  (See Docket Entry No. 14-11.)

### D.    Collateral Proceedings in State Fora

Petitioner then filed a PCR application with the trial court, which was dismissed.  After the dismissal, he filed an appellate brief with counsel supplemented by a submission executed pro se.  In Petitioner's counseled appellate brief, he argued a single point, - that the trial court erred by not affording him an evidentiary hearing during his PCR proceedings to address his contention that his trial counsel provided him with constitutionally inadequate legal assistance. (See Docket Entry No. 14-12, at 2.)  Petitioner's argument contained two sub-points, one discussing the state law as to the propriety of evidentiary hearings and another asserting that Petitioner presented a prima facie case of ineffective assistance of counsel.  (See id.)

In his supplemental brief filed pro se, Petitioner added one more point.  (See Docket Entry No. 14-13, at 2.)  Specifically, he argued as follows:

[M]y [c]ounsel, Mr. Constantine Loukedis, Esq. was provided with key facts [which, I believe could] have turned up the evidence needed to exonerate me . . . . One [such] fact is the Easy Pass device that was seized as "evidence" from my car. The device records my movement through toll plazas that do not fit the timeline of the murder . . . The second is of the Decedent's brother, John . . . [ who could] have [a] motive to commit the crime, [and] opportunity also. [John] had a [o]ne [m]illion dollar policy on [Richard] of which he had immediate access to. If investigated, it [c]ould [have been] found that he paid a gentleman only known as "Pablo" $80,000 of the first spendings of that money. One would think that it was money owed, but through investigation, it [c]ould [have] turn[ed] up that . . . [it was payment for] committing this crime and . . . setting me up for the crime. The other piece of "evidence", the .22 cal. bullets seized from my apartment were planted there. The Wighard' s had a key to my apartment and could easily access the apartment because being that I own restaurants in various parts of New York City and have many business dealing to attend, I am never home. . . . Now Mr. George Imperator [sic] was the other key witness for the Prosecution. Through investigation, it [c]ould [have] turn[ed] up that he ha[d] a motive to lie . . . [because] I loaned Mr. Imperatore unbelievable amounts of money because he was constantly in financial binds. He had no way of paying me. When I met him . . . [on the night of the murder], it wasn't . . . to get rid of the "weapon", it was to discuss a meeting that was I scheduled to attend [in] Florida . . . [which] involved approximately $7 [m]illion dollars . . . [K]eep in mind that after I allegedly told [Imperatore] about the murder, he invited me to stay . . . with not only him, but also his wife and children[.] That does not make any sense. . . . None of this was ever checked out [by my counsel].

(Docket Entry No. 14-13, at 3-4.)

The Appellate Division affirmed the dismissal of Petitioner's PCR application, noting that: (a) Petitioner, through his in-court testimony, informed the jurors of the Wighard's access to his apartment and, thus, of Petitioner's position that the ammunition was "planted," and the jurors rejected Petitioner's position; and (b) the remainder of Petitioner's assertions presented merely bold, self-serving conclusions lacking any documentary support.[1] See State v. Gambino,

---

[1] In addition, the Appellate Division addressed Petitioner's trial-level PCR challenges raised pro se, as a supplement to Petitioner's counseled trial-level PCR claims, observing:

> [Petitioner] contends that his attorney did not discuss the procedure with him nor present him with a coherent defense plan or strategy, but he fails to indicate what defense plan or strategy should have been provided or what procedures were not discussed, and how different conduct on the part of the attorney would have changed the outcome of the trial. [Petitioner] contends that he was not

2009 WL 735836, at *4.  On June 19, 2009, Petitioner's application for certification of his PCR claims was denied by the Supreme Court of New Jersey.  See State v. Gambino, 199 N.J. 543 (2009).

### E.    Original Habeas Proceedings Before Judge Hayden

On August 5, 2009, the Clerk received Petitioner's federal habeas application executed on July 31, 2009.  (See Gambino v. Ricci, Civil Action No. 09-3872 (KSH), Docket Entry No. 1, at 19.)  That application stated the following three grounds in support of Petitioner's challenges:

GROUND ONE:     Ineffective Assistance of Counsel.  (1) Failure to discuss case with Petitioner; (2) Failed to include Petitioner in selection of jury; (3) Failed to investigate defense witnesses; [(4)] Failed to investigate other evidence.[2]

GROUND TWO:     Judge Charge to Jury Was Fatally Flawed.  Judge told [the] jury they did not have to be unanimous and then gave a sequential charge on murder [plus] passion provocation [manslaughter] leading to a verdict on murder.

GROUND THREE:  The Judge Erred in Excluding the Victim's Criminal History.  Counsel moved to have the victim's criminal history, which included distribution of CDS, aggravated assault on a police officer, possession of counterfeit currency and sexual assault in support of passion provocation defense.  The Court denied the motion.

---

included by defense counsel in the jury selection process, but he fails to identify a single juror that should have been excluded or to identify any aspect of the jury selection process that would have been different had he been included.  [Petitioner] maintains that his attorney failed to address certain critical facts he called to the attorney's attention, failed to examine available records, and failed to adequately investigate the case.  Due to these failures, [Petitioner] maintains that if certain witnesses and information had been presented at trial, the outcome would have been different. Once again, [Petitioner] did not identify in the record before the trial court the additional witnesses or evidence that should have been presented at trial and that in all reasonable probability would have led to a different result.

Gambino, 2009 WL 735836, at *3.

[2]  Petitioner's factual statement in support of this Ground One indicates Petitioner's position that his defense counsel "failed to investigate [plus] call 2 defense witnesses (Al Sertie Ephonetic [and] John Barnett)."  Gambino v. Ricci, Civil Action No. 09-3872 (KSH), Docket Entry No. 1, at 6 (parenthetical in original).  Petitioner also makes a reference to his E-ZPass records.  See id.

Id. at 6-11.[3]

Petitioner's Civil Action No. 09-3872 was assigned to Judge Katharine S. Hayden ("Judge Hayden"), who advised Petitioner of his rights under Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000).  (See Gambino, Civil Action No. 09-3872, Docket Entry No. 2.)  Judge Hayden's Mason notice was, however, returned to the Clerk as undeliverable.  (See id., Docket Entry No. 3.)  Judge Hayden, therefore, directed administrative termination of Civil Action No. 09-3872 for Petitioner's failure to comply with Local Civil Rule 10.1(a), which requires unrepresented parties to advise the court of any change in address.  (See Gambino, Civil Action No. 09-3872, Docket Entry No. 4.)  However, out of an abundance of caution, Judge Hayden provided that, in the event Petitioner notified the Clerk of Petitioner's new address within four months from the date of termination, his Civil Action No. 09-3872 would be reopened.  (See id.)

Eleven months later, on November 19, 2010, the Clerk received a letter from Petitioner inquiring about the status of Civil Action No. 09-3872, and seven months after that, another letter: (a) promising to send Petitioner's filing fee of $5.00 "in two days"; and (b) offering Petitioner's amended habeas pleading.  (See id., Docket Entry No. 9, at 2-3. (discussing the same in detail); see also id., Docket Entry No. 7-1 (Petitioner's proposed amended pleading)).

---

[3] In other words, the submission docketed in Plaintiff's Civil Action No. 09-3872 raised: (a) claims repeating Petitioner's challenges asserted pro se during his trial-level PCR proceedings and (b) claims repeating Petitioner's counseled challenges raised during his direct appeal.

Judge Hayden, directed commencement of a new and separate habeas matter; her directive gave rise to the instant action, which was assigned to this Court.

### F.    Proceedings at Bar

#### 1.    Change in Petitioner's Grounds

Pursuant to Judge Hayden's order, the Clerk docketed Petitioner's instant amended pleading.   (See Instant Matter, Docket Entries Nos. 1 and 2.)   The Petition, however, qualitatively differed from Petitioner's original submission made in Civil Action No. 09-3872. (See Docket Entry No. 1, at 6-7 (unambiguously indicating that Petitioner's submission was copying, in toto, his supplemental PCR brief executed pro se)).   Specifically, the Petition asserted:

> [GROUND] ONE[:]        THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL . . . .
>
> [GROUND] TWO[:]        THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFLICT-FREE REPRESENTATION BY THE TRIAL ATTORNEY'S REPRESENTATION OF DEFENDANT DESPITE AN INHERENT CONFLICT . . . .
>
> [GROUND] THREE[:]        THE FAILURE OF THE TRIAL JUDGE TO RECUSE HIMSELF FROM THE DEFENDANT'S CASE DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHTS TO A FAIR TRIAL
>
> [GROUND] FOUR[:]        THE SEARCH OF DEFENDANT'S RESIDENCE AND ARREST OF THE DEFENDANT WAS IN VIOLATION OF THE FOURTH AMENDMENT OF THE UNITED STATES CONSTITUTION

Id. at 5 (capitalization in original); see also id. at 7 (reiterating the same).[4]

---

[4]  In addition, the Petitioner included in his instant Petition a copy of Petitioner's counseled PCR brief, raising the challenges already detailed supra.

However, right after so asserting, the Petitioner offered the Court another line of claims, stated in his "Addendum II." (See id. at 24.) These additional challenges asserted:

GROUND ONE: THE STATE COURT'S RULING THAT PETITIONER'S CLAIM THAT HE WAS DEPRIVED OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL WAS UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED, THEREFORE THE WRIT SHOULD ISSUE.

GROUND TWO: THE STATE COURT'S RULING THAT PETITIONER'S CLAIM THAT HE WAS DEPRIVED OF HIS FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO A FAIR TRIAL BY THE INADEQUATE SEARCH OF DEFENDANT'S RESIDENCE AND ARREST OF THE DEFENDANT WAS IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENT[S] AND WAS [AN] UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED THEREFORE THE WRIT SHOULD ISSUE UNDER [THE] U.S. CONSTITUTION.

GROUND THREE: THE STATE COURT'S RULING [ON] PETITIONER'S CLAIM THAT HE WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL [BECAUSE OF] THE FAILURE OF COUNSEL TO INVESTIGATE AND CALL WITNESSES FOR TRIAL WAS CONTRARY TO CLEARLY ESTABLISHED FEDERAL LAW[.] THEREFORE THE WRIT SHOULD ISSUE.

GROUND FOUR: THE FAILURE OF THE TRIAL JUDGE TO RECUSE HIMSELF FROM THE DEFENDANT'S CASE DEPRIVED DEFENDANT OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL[.] THEREFORE THE WRIT SHOULD ISSUE.

GROUND FIVE: THE STATE COURT'S RULING THAT PETITIONER'S CLAIM THAT HE WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONTATION OF WITNESSES WAS AN UNREASONABLE DETERMINATION OF THE FACTS IN LIGHT OF THE EVIDENCE PRESENTED THEREFORE THE WRIT SHOULD ISSUE.

GROUND SIX: THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFLICT-FREE REPRESENTATION BY THE TRIAL ATTORNEY'S

REPRESENTATION OF DEFENDANT DESPITE AN INHERENT CONFLICT, THEREFORE THE WRIT SHOULD ISSUE.

(Id. (capitalization in original)).

## 2.      Initial Procedural Developments

Judge Hayden's order directing commencement of this matter was docketed on July 21, 2011.  (See Gambino, Civil Action No. 09-3872, Docket Entry No. 9.)  Two weeks later, Petitioner submitted his filing fee.  (See Instant Matter, Docket Entry dated Aug. 4, 2011.)  This Court, taking notice of the substantial difference between Petitioner's initial submission made in Civil Action No. 09-3872 and the present Petition, issued Petitioner another Mason notice explaining to Petitioner that he must marshal all his habeas challenges in one all-inclusive application.  (See Instant Matter, Docket Entry No. 4.)  In response, Petitioner stated that he wished this Court to rule on his *original submission* filed in Civil Action No. 09-3872.  (See Instant Matter, Docket Entry No. 5.)  In addition, Petitioner stated that he was illiterate.  (See id.)

Petitioner's response posed a dual problem for this Court.  First, Petitioner's reference to his original submission filed in Civil Action No. 09-3872 seemingly reverted Petitioner's challenges solely to the three grounds stated in Civil Action No. 09-3872.  (Docket Entry No. 1.)  Second, the issue of whether Petitioner's failure to advise Judge Hayden of Petitioner's change in address remained unresolved.

Reflecting on the submissions made by Petitioner, this Court agreed with Judge Hayden's opinion that dismissing Petitioner's challenges solely on the basis of his failure to comply with Local Civil Rule 10.1(a) was an unduly harsh sanction, since Petitioner would be effectively disfranchised of his opportunity to obtain federal habeas review, because his AEDPA period of limitations had long expired.  Accord Williams v. Ricci, 2009 U.S. Dist. LEXIS 57582 (D.N.J.

9

July 6, 2009) (relying on <u>Urcinoli v. Cathel</u>, 546 F.3d 269, 272 (3d Cir. 2008), for the observation that, "the overall gist of the pertinent law suggests that, when faced with an ambiguous situation, the District Court should, out of an abundance of caution, err on the side of ensuring that the litigant's opportunity to seek full federal habeas review is preserved"). Therefore, in light of Petitioner's assertion that he was illiterate, the Court excused Petitioner's failure to comply with Rule 10.1(a)[5] and directed Respondent to answer Petitioner's challenges. (<u>See</u> Instant Matter, Docket Entry No. 6.)  Being mindful of the discrepancy between Petitioner's grounds asserted in his original submission filed in Civil Action No. 09-3872, the Petition at bar and the Addendum II to the Petition, this Court directed the Clerk to serve all documents on Respondent.  (<u>See id.</u>)  Petitioner was invited to traverse.  (<u>See id.</u>)

### 3.      Respondent's Answer and Petitioner's Post-Answer Filings

Following two extensions of time, Respondent filed two rounds of well-organized exhibits and, eventually, a brief answer addressing Petitioner's claims to the degree Respondent was able to comprehend Petitioner's challenges.  (<u>See</u> Docket Entries Nos. 12-1 to 12-2, 14-1 to 14-2,17 and 20 (detailing Respondent's difficulty with comprehending Petitioner's claims)).[6]

Petitioner replied by means of two letters, one submitted shortly after Respondent filed its exhibits and another executed in response to the answer.  (<u>See</u> Docket Entries Nos. 19 and 20.)

---

[5]  This Court notes an incongruence between Petitioner's instant assertion that he is illiterate and his claims maintaining that he was a successful owner of multiple prospering restaurants in New York City, and that he was entering multi-million-dollar business transactions.

[6]  Specifically, Respondent stated:

> "The problem here is that Mr. Gambino's petition . . . is, on close inspection, literally incomprehensible.  While I imagine that is not a terribly uncommon problem for <u>pro se</u> petitions, it is not a problem I have any experience with [having dedicated my prior efforts to state criminal and PCR proceedings, where criminal defendants are represented].  The grounds upon which Mr. Gambino seeks relief are stated in point headings . . . .  However, these point headings are just that.  They are entirely devoid of any factual underpinning or any argument. This leaves them so amorphous that they cannot be answered."
> (Docket Entry No. 17, at 1.)

The former effectively copied the supplemental pro se submission Petitioner filed with the Appellate Division during his PCR proceedings. (See Docket Entry No. 19 (referring to his E-ZPass records, expressing his opinion that John must have had a $1 million dollar insurance policy on Richard's life, that John must have "planted" the ammunition in Petitioner's apartment and must have hired a certain "Pablo" to kill Richard and to frame Petitioner in the murder, and that John must have paid Pablo $80,000 for these actions, while Mr. Imperatore must have committed perjury under oath in hope to escape his debts to Petitioner and that Petitioner met with him on the night of the murder to share his excitement about a multi-million deal in Florida rather than to dispose of the murder weapon)).[7]  The second letter seemingly invited this Court to conduct an investigation of Petitioner's trial judge, defense counsel and prosecutor and address all the criminal charges lodged by the State against Petitioner anew.[8]  (See Docket Entry No. 20.)

## II.    SUMMARY OF PETITIONER'S CHALLENGES

This Court agrees with Respondent that the scope and particularities of Petitioner's challenges are not easy to understand, especially in light of Petitioner's seeming change from his

---

[7]  This first letter added to the confusion as to the scope of Petitioner's challenges, since these claims differed from the three original grounds (raised in Civil Action No. 09-3872) to which Petitioner seemingly reverted upon this Court's issuance of the Mason notice.  Indeed, the statements made in Petitioner's first letter were well in line with the claims he raised in the Petition filed in this matter (i.e., in the amended pleading filed in Civil Action No. 09-3872).

[8]  Specifically, Petitioner stated:

> This letter is to point out the discrepancies in the prosecutor's statements and to disclose the true facts in this case. The following are a few facts that were clearly misrepresented at trial: Ms. Roll actually testified that, after breaking down in tears, that, "Mr. Gambino is a good man and could never have killed anybody."  During a telephone call between Ms. Roll and myself, I never told her anything concerning a shooting, or anything of that nature.  My attorney, Mr. Loukedis, sold me out and worked along with the trial judge, as well as the prosecutor to convict me of a crime that I did not commit and send me to prison for as long as they possibly could.  Mr. Carlos Sanchez, who gave my attorney key evidence proving my innocence, ended up with the same lawyer and judge.  The judge, Marmo, repeatedly told Mr. Sanchez just how good Mr. Loukedis really was.  Mr. Hoffman, the prosecutor in my case [lied] about everything during the entire proceedings.

(Docket Entry No. 20.)

original three claims to the compilation of claims asserted in the present Petition and then reverting back to the original three claims, and then finally switching back to the claims asserted in the Petition.  Analogously, Respondent is correct in its observation that Petitioner's challenges should have been expressed in terms of precise legal claims supported by clearly detailed factual predicate.  See McFarland v. Scott, 512 U.S. 849, 856 (1994) ("Habeas corpus petitions must meet heightened pleading requirements); see also 28 U.S.C. § 2254.

However, being mindful of Petitioner's pro se litigant status, and taking into consideration that Petitioner's various grounds present, effectively, close paraphrasings of the challenges he raised in state court, it appears in the interests of justice to entertain all of Petitioner's claims.  In light of Petitioner's frequent repetition of the same claims in different contexts, this Court finds it warranted to systemize all these allegations into the following four clusters of claims:

Ground One:                        Challenges Unrelated to Petitioner's Trial: Petitioner's apartment
                                   was searched in violation of Petitioner's Fourth Amendment rights.[9]

---

[9]  This Court construes this claim as asserting that the ammunition and holster obtained by the police as a result of the search were "fruits of the poisonous tree" and should have been excluded from the evidence presented to the jury.  This Court agrees with Respondent that Petitioner's false arrest challenges cannot be included in the scope of habeas review (since Petitioner did not make any self-incriminating statements to the police and, hence, his trial result would be the same, regardless of whether he was or was not arrested).

> Reflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held pursuant to such process — when, for example, he is bound over by a magistrate or arraigned on charges.  Thereafter, unlawful detention forms part of the damages for the "entirely distinct" tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by wrongful institution of legal process.  "If there is a false arrest claim, damages for that claim cover the time of detention up until issuance of process or arraignment, but not more.  From that point on, any damages recoverable must be based on a malicious prosecution claim and on the wrongful use of judicial process rather than detention itself."

Wallace v. Kato, 549 U.S. at 389-90 (quoting Heck v. Humphrey, 512 U.S. 477, 484 (1984)).

Ground Two:                    Challenges to Assistance Provided by Trial Counsel:  Petitioner is

of opinion that his trial counsel had an inherent conflict of interest with

Petitioner because Petitioner believes that his counsel "sold him out."

Petitioner's belief to that effect is derived from the limited time his trial

counsel spent with him prior to the trial, from the counsel's limited

discussions of trial strategy beyond obtaining Petitioner's version of events

and from trial counsel taking charge of the <u>voir dire</u> and declining to

entertain Petitioner's requests to attempt disqualification or use of

peremptory challenges as to prospective jurors whom Petitioner did not

like.   Petitioner's belief is also derived from his opinion that his trial

counsel neglected to investigate certain documents or pursue certain leads

which, Petitioner guesses, might have provided exculpatory information.[10]

Ground Three:                  Challenges Related to the Decisions Reached by Petitioner's Trial

Court

---

[10]   It appears that Petitioner confuses his rights under the Confrontation Clause with the suppression of evidence issue, since his challenge, linking the Sixth Amendment right to effective assistance of counsel to the Confrontation Clause, refers to the decision of his trial judge to deny Petitioner's counsel's motion to introduce the victim's criminal record.  However, the protections of the Confrontation Clause are of a different nature: they assure that the accused has an opportunity to face the witnesses giving statements against him in open court.  As the Supreme Court stated, "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  <u>Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (<u>per curiam</u>).  Here, the victim was dead and did not testify or provide the jurors with any information, while all other witnesses were cross-examined in open court.

a.      The trial court erred in denying defense counsel's application to offer the victim's criminal history to the attention of Petitioner's jurors, since Petitioner believes that the jury, had it been exposed to such information, would have convicted Petitioner of passion-provocation manslaughter and not murder.

                b.      The trial court erred in selecting the language of the jury charge given, since Petitioner believes that the instructions left the jury under the impression that a unanimous verdict of guilt as to each count was not required.  Petitioner opines that such an impression must have been amplified by the trial court providing the jurors with a passion-provocation manslaughter charge right after giving the jury instructions as to the offense of murder.

                c.      The trial court erred by not recusing itself from presiding over Petitioner's trial, since Petitioner believes that the trial judge was biased against him and wished to see Petitioner convicted.

Ground Four:      Petitioner's conviction was against the weight of evidence or resulted from a trial infected by reversible cumulative error.

## III.    STANDARD OF REVIEW

### A.    General Principles

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of

the United States.

28 U.S.C. § 2254(a).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen Cnty. Prob. Dept., 128 F.3d 152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.  It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts."  Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982).[11]

A district court must give deference to determinations of state courts.  Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996).  Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary."  Stevens v. Delaware Corr. Ctr., 295 F.3d 361, 368 (3d Cir. 2002).  Where a federal claim was "adjudicated on the merits" in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim:

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[11]  "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation  omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

28 U.S.C. § 2254(d).[12]

A decision is "contrary to a Supreme Court holding if the state court contradicts the governing law set forth in [the Supreme Court's] cases or if it confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result."   Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (internal citations and quotations omitted).[13]

### B.   Petitioner's Letters Submitted in Lieu of Traverse

Here, Petitioner's letters submitted in lieu of traverse indicate his hope that this Court would: (a) effectively, conduct Petitioner's trial de novo, reflecting on the veracity of State witnesses and Petitioner himself; and (b) conduct its own investigation of Petitioner's trial judge, his prosecutor and his defense counsel to determine whether Petitioner's belief that his trial counsel "sold him out" has any basis.  However, the mandate of federal habeas review is narrow. "Review on federal habeas is an exception to the normal rules of finality of judgments."   Ellis v. Lockhart, 875 F.2d 200, 202 (8th Cir. 1989).  Therefore, this Court's analysis is limited solely to the determination of whether the state court's rulings reached during direct appellate or collateral review were "contrary to" a Supreme Court holding.  With respect to claims adjudicated on the merits by state courts, see 28 U.S.C. § 2254(d), the Supreme Court has explicitly held that

---

[12] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."   Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever.

[13]   Under the "'unreasonable application'" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."   Id. at 413.  Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.  Id. at 409-10.  A court begins the analysis by determining the relevant clearly established law.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision."   Williams, 529 U.S. at 412.

federal courts are limited to consideration of the record that was before the state court which adjudicated the claim on the merits.  See Cullen v. Pinholster, 131 S. Ct. 1388, 1398-1401 (2011).

Thus, while the Court is mindful of Petitioner's emotions and hope associated with federal review, this Court has no basis to conduct any hearings, investigations or other expansions of the record.

## IV.   DISCUSSION

### A.   Challenge Based on the Allegedly Illegal Search of the Apartment

Petitioner's first challenge is based on his belief that his apartment was illegally searched. This challenge, as pled, states a civil rights claim rather than a habeas claim.  However, construing these allegations liberally, the Court reads it as a claim that the ammunition and holster found by the police during the search of Petitioner's apartment should not have been allowed into evidence.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998) (a pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance).[14]

Here, Petitioner's Fourth Amendment claims are governed by the Supreme Court's decision in Stone v. Powell, 428 U.S. 465 (1976), holding:

> [W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas

---

[14]  Generally, "the Due Process Clause does not permit the federal courts to engage in a finely-tuned review of the wisdom of state evidentiary rules."  Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  The admissibility of evidence is a question of state law not cognizable under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001) ("A federal habeas court . . . cannot decide whether the evidence in question was properly allowed under the state law of evidence"); Hickey v. Jeffes, 571 F.2d 762, 766 (3d Cir. 1978) ("As to the contention that the trial court erred in admitting the victim's testimony of a prior flirtatious conversation, we find that, if there was any error in the court's ruling . . . that error was at best one of interpretation of the state's law of evidence and did not arise to constitutional dimensions").

relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Id. at 494 (footnotes omitted); see also Cardwell v. Taylor, 461 U.S. 571 (1983) (per curiam) (consideration of a claim that evidence admitted at trial was the fruit of a search incident to an illegal arrest could not be considered in a habeas corpus petition as long as the state courts had afforded a full and fair opportunity to litigate that claim).

The Stone Court stressed that the exclusionary rule "is not a personal constitutional right," and that the rule is not designed to redress the injury to a privacy interest that results from a Fourth Amendment violation.  See Stone v. Powell, 428 U.S. at 486.  "The Court reasoned that the incremental benefit in deterring illegal police conduct by applying the exclusionary rule in a habeas proceeding did not outweigh the cost to society of excluding relevant, reliable evidence in a criminal prosecution."  Gilmore v. Marks, 799 F.2d 51, 54-55 (3d Cir. 1986); see also Marshall v. Hendricks, 307 F. 3d 36, 82 (3d Cir. 2002).[15]

Here, Petitioner had a full and fair opportunity to present his Fourth Amendment claim to the New Jersey courts.  Petitioner "is at most alleging that the Fourth Amendment claims were decided incorrectly or incompletely by the New Jersey courts, allegations which are insufficient to surmount the Stone bar."  Marshall, 307 F. 3d at 82.  Because Petitioner had a full and fair opportunity to litigate his Fourth Amendment claim and "[a]n erroneous . . . resolution by a state court of a Fourth Amendment claim does not overcome the [Stone] bar," Petitioner's challenge is not cognizable in this § 2254 proceeding.  Id.; see Hubbard v. Jeffes, 653 F.2d 99, 103 (3d Cir. 1981).  Therefore, it does not merit habeas relief.

---

[15] "Even otherwise potentially meritorious Fourth Amendment claims are barred on habeas when the petitioner had a full and fair opportunity to litigate them."  Deputy v. Taylor, 19 F.3d 1485, 1491 (3d Cir. 1994) (citing Gilmore, 799 F.2d at 57, and rejecting the argument that erroneous determination of habeas petitioner's Fourth Amendment claim overcomes Stone simply because the claim was set forth in terms of a due process violation).

**B.      Challenge Based on the Assistance Provided by Defense Counsel**

**1.      General Legal Principles**

The Sixth Amendment, applicable to states through the Due Process Clause of the Fourteenth Amendment, guarantees the accused the "right . . . to have the Assistance of Counsel for his defense."   U.S. Const. amend. VI.   The right to counsel is the right to the effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  See Strickland, 466 U.S. at 687.  First, the defendant must "show that counsel's representation fell below an objective standard of reasonableness."   Id. at 687-88.[16]   The court must then determine whether, in light of all the circumstances at the time, the identified errors were so egregious that they were outside the wide range of professionally competent assistance.   See id.

To satisfy the prejudice prong, the defendant must show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."  Id. at 695.   As the Supreme Court explained,

> [i]n making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.  Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways.  Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

---

[16]  See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

> Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors.

Strickland, 466 U.S. at 695-96.[17]

### 2.    Petitioner's "Conflict-of-Interest" Position

For the purposes of Sixth Amendment analysis, the term "conflict of interests" has a meaning qualitatively different from a litigant's purely emotional belief that his counsel must have been involved in a secret conspiracy with the prosecutor and trial judge and worked toward getting Petitioner convicted.   Under Strickland, an "actual" conflict of interest is that which in fact adversely affected counsel's performance at trial, e.g., a conflict resulting from multiple representations or from representation of a client who sues the representing attorney, "as opposed to a mere theoretical division of loyalties" hypothesized by the criminal defendant.[18]   Mickens v. Taylor, 535 U.S. 162, 171 (2002); see also United States v. Hamilton, 409 F. App'x 584, 586 (3d Cir. 2011) (relying on United States v. Segarra-Rivera, 473 F.3d 381, 385 n.2 (1st Cir. 2007));

---

[17]   The Supreme Court instructs that a court need not address both components of an ineffective assistance claim "if the defendant makes an insufficient showing on one."   Strickland, 466 U.S. at 697.   "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."   Id.

[18]   For instance, an attorney's continuous representation of the client who merely threatens the attorney with the danger of future termination of appointment (or with the danger of having a disciplinary grievance filed against that attorney) does not introduce an "actual" conflict of interest into the attorney's conduct.   See, e.g., United States v. Rodriguez, 612 F.3d 1049 (8th Cir. 2010) (finding no conflict of interest on the part of defense attorney whose client threatened him with filing a disciplinary grievance, since "appointed counsel could not have 'gleaned any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions on the [defendant's] behalf at trial'") (quoting United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993), and citing Winfield v. Roper, 460 F.3d 1026, 1040 (8th Cir. 2006), Carter v. Armontrout, 929 F.2d 1294, 1299-1300 (8th Cir. 1991), and Smith v. Lockhart, 923 F.2d 1314, 1321 n.11 (8th Cir. 1991), in support of the conclusion that "any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys" is laden with the danger of overreaching, and a true conflict arises only if the pending suit in fact puts the defendant against his attorney).

accord <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 346-48 (1980) (holding that prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance," while stressing that a mere possibility of conflict is insufficient to impugn a criminal conviction); <u>but see</u> <u>Glasser v. United States</u>, 315 U.S. 60, 72-75 (1942) (reversing conviction upon finding that trial counsel's failure to cross-examine a prosecution witness which linked defendant with the crime resulted from counsel's established desire to diminish the jury's perception of a co-defendant's guilt).

Here, Petitioner offers this Court merely his speculation as to his counsel's secret desire to have Petitioner convicted and/or the allegedly secret conspiracy between his counsel, the prosecutor and trial judge.  However such assertions are insufficient to establish the prejudice prong of <u>Strickland</u>, and so no habeas writ is warranted on that ground.

### 3.     Petitioner's Disappointment with the Amount of Communication

Petitioner's submissions clarify that his belief that his defense counsel "sold him out" is derived, in part, from Petitioner's disappointment with the limited amount of time his counsel spent communicating with Petitioner or discussing defense strategy.

A habeas petitioner, however, cannot establish ineffective assistance of counsel by "assert[ing] . . . a mechanical calculation of alleged meetings and then, self-servingly, declare[ing] the amount of such alleged meetings insufficient," <u>Cox v. Ricci</u>, 2010 U.S. Dist. LEXIS 115711, at *15-16 (D.N.J. Oct. 29, 2010); <u>accord</u> <u>Layne v. Moore</u>, 90 F. App'x 418 (3d Cir. 2004) (affirming dismissal of habeas challenge asserting that trial counsel was ineffective because counsel met with the petitioner only three times prior to trial); <u>Brownlee v. Haley</u>, 306

21

F.3d 1043 (11th Cir. 2002) (denying habeas relief for claim that trial counsel met with the petitioner only two times for 10 (ten) to 15 (fifteen) minutes each).[19]

Here, Petitioner maintains that his counsel spent insufficient time meeting with Petitioner and/or discussing the strategy of the case.  However, the 542-page transcript of Petitioner's trial shows that Petitioner's counsel was well-aware of off key aspects and minute details of Petitioner's case and consistently and ardently presented Petitioner's position (that he was innocent of Richard's murder) throughout every stage of the trial.  (See Docket Entries Nos. 12-1 to 12-12.)  Since Petitioner concedes that the trial judge praised defense counsel's experience, and the record reveals both the counsel's fluency in the facts underlying Petitioner's conviction and his ardor in representing Petitioner's interests, Petitioner's disappointment with the amount of time he spent communicating with his defense attorney fails to establish that his counsel did not function as a meaningful adversary to the State.  Therefore, Petitioner's claim fails to meet the second prong of Strickland and merits no habeas relief.

### 4.    Petitioner's Disappointment with the Voir Dire Proceedings

Petitioner's disappointment with his counsel taking charge of the voir dire proceedings is equally unavailing.  The Supreme Court observed that the constitutional right to presence is rooted in both the Confrontation Clause and the Due Process Clause, and explained that a

---

[19]  In United States v. Cronic, 466 U.S. 648 (1984), the Supreme Court held that a defendant's conviction must be automatically reversed without any specific showing of prejudice "when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding."  Id. at 659 n.25.  In all other scenarios, the Cronic Court noted, the analysis turns on five factors "relevant to an evaluation of a lawyer's effectiveness in a particular case," id. at 663, without stating that all of the criteria are required or that these are the only factors a court may consider.  These factors were: "(1) the time afforded for investigation and preparation; (2) the experience of counsel; (3) the gravity of the charge; (4) the complexity of possible defenses; and (5) the accessibility of witnesses to counsel."  Cronic, 466 U.S. at 652 (citations omitted).  The total analysis of the criteria must "demonstrate that counsel failed to function in any meaningful sense as the Government's adversary."  Id. at 666; accord Dougherty v. Stickman, 2005 U.S. App. LEXIS 24988 (3d Cir. Nov. 17, 2005) (petitioner's claims that he and his attorney met for only five to fifteen minutes the morning of the trial was insufficient to warrant habeas relief).

defendant has a constitutional right to be present at all trial-related proceedings "whenever his presence has a relation, reasonably substantial, to the fulness [sic] of his opportunity to defend against the charge." United States v. Gagnon, 470 U.S. 522, 526 (1985) (per curiam), (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-106 (1938)). However, this right merely ensures that the defendant is allowed an opportunity "to give advice or suggestion[s] . . . to . . . his lawyers." Snyder, 291 U.S. at 106.

Thus, the right to presence does not obligate defense counsel to adhere to their client's desires if such desires lack any legal basis.

> An attorney's obligation to consult with his client "does not require counsel to obtain the defendant's consent to 'every tactical decision.'" Florida v. Nixon, 543 U.S. 175, 187 (2004) (quoting Taylor v. Illinois, 484 U.S. 400, 417-18, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988)). [For instance, such matters as] the choice to proceed before a magistrate judge during voir dire [or] the decision to have a criminal defendant present . . . during individual voir dire conducted at sidebar is tactical and does not require the defendant's express consent.

United States v. Johnson, 677 F.3d 138, 141 (3d Cir. 2012).

Here, Petitioner asserts that his counsel refused to challenge potential jurors. However, as the state court observed, while "[Petitioner] contends that he was not included by defense counsel in the jury selection process, . . . he fails to identify a single juror that should have been excluded or to identify any aspect of the jury selection process that would have been different had he been included." Gambino, 2009 WL 735836, at *3. Without detailing which selected juror was not qualified to serve as an objective trier of fact, and why, Petitioner's displeasure with his counsel's strategic choices cannot amount to a cognizable claim under Gagnon, Snyder, Nixon or Taylor. Therefore, Petitioner's challenges fail to meet either prong of the Strickland test, and the state court's dismissal of his allegations was not an unreasonable application of Supreme Court precedent. Thus, Petitioner's claim does not merit habeas relief.

23

5.      **Failure to Investigate Claims**

Finally, Petitioner maintains that his counsel's assistance deprived him of his Sixth Amendment rights because his attorney did not investigate certain leads, theories or witnesses. Petitioner opines that, had these investigations been made and/or witnesses called, his innocence might have been established. These arguments do not merits habeas relief. As one court observed:

> Petitioner's . . . argument is that his defense counsel's performance was deficient because the defense counsel failed to locate and present certain testimonial evidence. Petitioner speculates that such testimonial evidence might have supported his theory of the case and he deduces from that speculation that his defense counsel's failure to locate such evidence and investigate it was an act of ineffective assistance within the meaning of the <u>Strickland</u> standard. In <u>Rolan v. Vaughn</u>, 445 F.3d 671 (3d Cir. 2006), the Court of Appeals underscores two key principles governing this type of inquiry: (a) counsel is not obligated to chase after the wind (e.g., by striving to locate long-shot evidence) in hopes of stumbling upon a piece of evidence that might turn out favorable; and (b) habeas relief may be warranted only upon the petitioner's showing that such evidence was so favorable to the petitioner that lack thereof resulted in prejudice to the petitioner's case within the meaning of the second prong of <u>Strickland</u>. <u>See</u> <u>Strickland</u>, 466 U.S. at 690-91;

Here, the state court dismissed Petitioner's allegations pointing out that they present merely self-serving guesswork. <u>See</u> <u>Gambino</u>, 2009 WL 735836, at *4. Similarly, Petitioner did not provide this Court with any affidavit (by a person whom his counsel allegedly failed to call) averring that this person was both willing and able to testify and clarifying what that testimony would be.[20] Thus, Petitioner's allegations do not show that the state court's decision was an unreasonable application of <u>Strickland</u>.

---

[20]  In fact, even the identities of the witnesses Petitioner's counsel allegedly failed to investigate and call to testify are unclear, since Petitioner made only passing references to a certain Carlos Sanchez, Al Sertie Ephonetic and John Barnett, without informing this Court what they could have testified to.

The foregoing leaves this Court only with Petitioner's assertion that, had his counsel examined the records generated by the E-ZPass installed in Petitioner's vehicle, the outcome of his trial would have been different.  This Court disagrees.

The record established – and Petitioner does not appear to dispute – that, after hearing the shots, John found Richard mortally wounded and called police; upon their arrival, police officers determined that both Petitioner and his vehicle were not at his place of residence.  The record also shows that, about three hours after the murder, Petitioner talked to Roll by phone and, shortly after 11:00 p.m. on that night, Petitioner called Imperatore, who met with Petitioner at the rest stop in Montvale.  See id. at 28-29.  Imperatore testified that Petitioner arrived, in a red Chevrolet Malibu, around midnight.[21]  See id.  No information in the record or in Petitioner's statements placed him *in* the Malibu at the time of Richard's murder.  Thus, even if this Court is to hypothesize that Petitioner actually had an E-ZPass in the Malibu and, in addition, that E-ZPass registered toll payments at or about the time of Richard's murder at tlocales distant from the Wighard residence, that E-ZPass record would not operate as exculpatory evidence unless Petitioner offered proof that he, rather than some other person, was in the Malibu at the time of the murder.

Since Petitioner did not offer such proof to this Court (or to the state courts), there is no basis to presume that Petitioner offered such proof to his counsel.  Correspondingly, it was a strategically reasonable decision for Petitioner's counsel not to seek E-ZPass records, which could not provide Petitioner with a viable alibi.[22]

---

[21]  The Court is not entirely clear as to which vehicle Petitioner referred to when he made claims on the basis of the E-ZPass in "his" car.  Reading Petitioner's claims most liberally, the Court presumes – without making a factual finding to that effect – that Petitioner referred to the red Malibu.

[22]  Because the Strickland test is one of objective reasonableness, it does not matter if counsel actually considered

Petitioner offers this Court only his self-serving guesses [about] "something," and that such "something" could have, somehow, [added] support or credence to Petitioner's theory of the case. However, Petitioner's guesswork cannot be accepted in lieu of actual evidence. Cf. Salyer Land Co. v. Tulare Lake Basin Water Storage Dist., 410 U.S. 719, 731 (1973) (legal "adjudication cannot rest on any such 'house that Jack built' foundation"). In order to state a cognizable claim, he had to show that such [proof] actually existed, . . . and these specific facts would have been so favorable to Petitioner that . . . [he] suffered prejudice within the meaning of the second prong of Strickland.

Sierra, 2012 U.S. Dist. LEXIS 145378, at *85 (citations omitted)..

Since Petitioner's failure-to-investigate challenges fail to meet either prong of Strickland, the state court's rejection of these claims was not an unreasonable application of Supreme Court precedent. Thus, these claims do not warrant habeas relief.

### C. Challenges Related to the Decisions Reached by the Trial Court

#### 1. Exclusion of the Victim's Criminal History

During Petitioner's trial, his counsel attempted to introduce evidence of the victim's assault conviction (rendered by a municipal court in 1973), 1979 possession-of-counterfeit currency conviction and 1988 conviction on drug-related charges. (See Docket Entry No. 14-7, at 9.) The trial court ruled that Richard's past convictions were not relevant to the issues in Petitioner's trial. See id.

On direct appeal, Petitioner argued that Richard's past criminal history should have been allowed into evidence, based on his hope that the jurors could conclude that Richard had "violent character," and so Petitioner killed Richard "in a fit of passion and/or provocation." Id.[23] The Appellate Division disagreed, pointing out that Richard's criminal history had no probative value

---

the course taken or foregone to determine whether the actions or omissions were objectively reasonable; so long as a hypothetical reasonable attorney could have done the same, there is no ineffectiveness. See Chandler v. United States, 218 F.3d 1305, 1316 n.16 (11th Cir. 2000).

[23] This Court is not entirely clear as to how a conviction of passion/provocation manslaughter could be reconciled with Petitioner's position that he was innocent of Richard's murder.

for the purposes of his murder in 2000, especially since there was no evidence that: (a) Richard "acted in a violent manner on the night he was killed"; or that (b) Petitioner was aware of Richard's criminal past.  Id. at 10.

"[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules."  Marshall v. Lonberger, 459 U.S. 422, 438 n.6 (1983).  The admissibility of evidence is generally a question of state law which is not cognizable under habeas review.  See Keller v. Larkins, 251 F.3d 408, 416 n.2 (3d Cir. 2001). However, "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." Holmes v. South Carolina, 547 U.S. 319, 324 (2006) (quoting Crane v. Kentucky, 476 U.S. 683, 690 (1986)).  "This right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary or disproportionate to the purposes they are designed to serve.'" Holmes, 547 U.S. at 324 (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)).

> While the Constitution . . . prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as [lack of relevance, waste of time,] confusion of the issues, or potential to mislead the jury . . . . Plainly referring to rules of this type, we have stated that the Constitution permits judges to "exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice [or] confusion of the issues."  Crane, [476 U.S.] at 689-690[;] . . . 40A Am. Jur. 2d, Homicide § 286, 136-138 (1999) ("[T]he accused may introduce any legal evidence tending to prove that another person may have committed the crime with which the defendant is charged . . . [Such evidence] may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial" (footnotes omitted).

Holmes, 547 U.S. at 326-327; see also Taylor v. Illinois, 484 U.S. 400, 410 (1988) ("The accused does not have an unfettered right to offer testimony that is . . . inadmissible under standard rules of evidence").

Here, Petitioner merely expresses his hope that the jury might have correlated Richard's convictions that took place many years prior to his murder, to the night when he was killed. However, such evidence is within the category of remote, speculative and prone to introducing undue confusion, expressly cautioned against by the Holmes Court. Therefore, the state court's decisions were not an unreasonable application of the governing Supreme Court precedent and Petitioner is not entitled to habeas relief on this ground.

## 2.     Challenges to the Jury Charge

Petitioner's challenge to the jury charge given by his trial judge is two-fold; he maintains that the instructions: (a) allowed the jurors a conclusion that no unanimous verdict as to his guilt was needed; and (b) employed such a sequence of charges that the jurors were virtually precluded from considering a passion/provocation conviction.

### a.     *Unanimity*

Petitioner's trial judge instructed the jury as follows:

> All jurors do not have to agree unanimously concerning which form of murder is present as long as all believe that it was one form of murder or the other. However, for a defendant to be guilty of murder, all jurors must agree that the defendant either knowingly or purposely caused death or serious bodily injury resulting in death to Richard Wighard. So don't misunderstand this, *your verdict must be unanimous* that it was murder as I've defined murder for you. It is not necessary that all of you agree, all 12 deliberating jurors agree as to the form of murder as long as 12 must agree it was murder.

(Docket Entry No. 14-7, at 12 (emphasis added)).

Dismissing Petitioner's challenges to that language, the Appellate Division underscored that this instruction "clearly and unambiguously" directed the jurors that their decision as to Petitioner's guilt had to be unanimous.  Id. (citing state law and the Model Criminal Jury Charge in support of the finding that the trial court was correct in its observation that the jurors did not have to agree as to the form of the premeditated murder, so long as they agreed on the murder).

The Due Process Clause can be violated by erroneous jury instructions only where "the erroneous instructions have operated to lift the burden of proof on an essential element of an offense as defined by state law."  Smith v. Horn, 120 F.3d 400, 416 (3d Cir. 1997); see also In re Winship, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged"); Sandstrom v. Montana, 442 U.S. 510, 523 (1979) (only those jury instructions that suggest a jury may convict without proving each element of a crime beyond a reasonable doubt violate the constitutional rights of the accused).[24]  Here, no statement made by the trial court lifted the State's burden of proof as to any element of the offence of murder, of which Petitioner was convicted.  Moreover, no statement made by the trial judge allowed the jurors to reach a non-unanimous verdict on the charge of murder.  Therefore, the state courts' finding that Petitioner's rights were not violated by the instructions, as given, was not an

---

[24]  Where a federal habeas petitioner challenges jury instructions given in a state criminal proceeding,

> the only question for [federal courts sitting in habeas review] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record.  In addition, in reviewing an ambiguous instruction . . . , [federal courts] inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.  And we also bear in mind our previous admonition that [federal courts] "have defined the category of infractions that violate 'fundamental fairness' very narrowly . . . Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation."

Estelle v. McGuire, 502 U.S. 62, 72-73 (1991) (citations omitted).

unreasonable application of Supreme Court precedent, and Petitioner is not entitled to relief on this ground.

**b.**   *Sequence*

Charging the jury, Petitioner's trial judge provided a sequence of instructions, first addressing the crime of murder, then passion/provocation manslaughter, then aggravated manslaughter and, finally, reckless manslaughter.  (See Docket Entry No. 14-7, at 7.)  The judge explained to the jurors that they were to consider the charges in sequential fashion (meaning, if the jury found Petitioner not guilty of the first offense, they had to consider the next offense, and so on).  On direct appeal, and here, Petitioner asserted that use of such sequential charge might have "caused the jury to convict defendant of murder, the first-mentioned and most serious charge," hypothesizing that, had the charge been not sequential, he might have been convicted of a passion/provocation manslaughter.  (Id.)  However,

> the trial judge specifically instructed the jury that the State had the burden of proving the absence of passion/provocation as an element of the murder charge. The judge instructed the members of the jury:
>
>> The third element that the State must prove beyond a reasonable doubt to find the defendant guilty of murder is that the defendant *did not act in the heat of passion resulting from a reasonable provocation*. . . .
>
> The judge proceeded to explain the four elements that must be established to find defendant guilty of passion/provocation manslaughter.  In doing so, the judge stated:
>
>> If you determine that the State has proven beyond a reasonable doubt that *there was not adequate provocation or that the provocation did not actually impassion the defendant or that the defendant had a reasonable time to cool off, or that the defendant actually cooled off*; and in addition to proving one of those four factors, you determine that the State has proven beyond a reasonable doubt that the defendant purposely or knowingly caused

> death or serious bodily injury resulting in death, you must find
> defendant guilty of murder.

(Id. at 8 (emphasis added)).

The state court's explanation was not an unreasonable application of Supreme Court precedent, since no statement in the instruction lifted the State's burden of proof as to any element of the offense of murder. Therefore, Petitioner is not entitled to habeas relief on this ground.

### 3.    Recusal

Petitioner also asserts that his trial judge erred by not recusing himself, since Petitioner believes that the judge was biased against him and secretly wished to see Petitioner convicted. Judicial recusal is required "if a reasonable person, knowing all the circumstances, would expect that the judge would have actual knowledge" of his/her interest or bias in a case.[25] See Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 860 (1988); In re Kensington Intern. Ltd., 368 F.3d 289, 301 (3d Cir. 2004). "[B]eliefs or opinions which merit recusal must involve an extrajudicial factor," Selkridge v. United of Omaha Life Ins. Co., 360 F.3d 155, 167 (3d Cir. 2004) (internal quotation marks and citation omitted), and "judicial rulings alone almost never constitute a valid basis" for recusal,[26] since judicial decisions "in and of themselves can only in

---

[25]   The facts should be considered as they would appear to a "well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." U.S. v. Jordan, 49 F.3d 152, 156 (5th Cir. 1995); accord Clemens v. United States District Court for the Central District of California, 428 F.3d 1175, 1178 (9th Cir. 2005); Matter of Mason, 916 F.2d 384, 386 (7th Cir. 1990).

[26]   A judge's prior adverse rulings cannot serve as the bias necessary for recusal. See, e.g., Byrne v. Nezhat, 261 F.3d 1075, 1103 (11th Cir. 2001); United States v. Pearson, 203 F.3d 1243, 1277 (10th Cir. 2000); Leslie v. Grupo ICA, 198 F.3d 1152, 1160 (9th Cir. 1999); United States v. Arena, 180 F.3d 380, 398 (2d Cir. 1999); Matter of Hipp, Inc., 5 F.3d 109, 116 (5th Cir. 1993). This is true even if the judge consistently made adverse rulings against the party, see McCalden v. California Library Assoc., 955 F.2d 1214, 1224 (9th Cir. 1990); United States v. Mobile Materials, Inc., 881 F.2d 866, 877 (10th Cir. 1989), because an adverse decision, even if it is adverse on all issues raised, is not evidence of bias, especially when it is supported by the law and facts. See Crenshaw v. Hodgson, 24 F. App'x 619, 621 (7th Cir. 2001).

the rarest of circumstances evidence the degree of favoritism or antagonism required" to prove bias. <u>Liteky v. United States</u>, 510 U.S. 540, 555 (1994).

Here, Petitioner asserts nothing but his suspicions and builds his claims solely on the unfavorable rulings issued by the trial judge. Petitioner's challenge is without merit and does not warrant habeas relief.

### 4.   Due Process Challenges

Petitioner's due process challenges, variously paraphrased throughout his original submission, in his Petition and "Addendum II," appear two-fold. First, Petitioner asserts that his trial had imperfections resulting in a cumulative error warranting habeas relief. Second, Petitioner asserts that the jurors erred by crediting the State's evidence more than Petitioner's evidence.

### a.   *Cumulative Error*

A claim that one was denied "due process" is a claim that one was denied "fundamental fairness." <u>See</u> <u>Riggins v. Nevada</u>, 504 U.S. 127, 149 (1992) ("We have said that 'the Due Process Clause guarantees the fundamental elements of fairness in a criminal trial'") (internal citation omitted); <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941) ("The aim of the requirement of due process is . . . to prevent fundamental unfairness"). The Supreme Court has cautioned:

> In the field of criminal law, we have defined the category of infractions that violate "fundamental fairness" very narrowly based on the recognition that, beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. The Bill of Rights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the Due Process Clause invites undue interference with both considered legislative judgments and the careful balance that the Constitution strikes between liberty and order . . . [I]t has never been thought that decisions under the Due Process Clause establish this Court as a rule-making organ for the promulgation of state rules of criminal procedure.

Medina v. California, 505 U.S. 437, 443-44 (1992) (internal quotations and citations omitted).

Thus, criminal defendants are entitled to a fair, but not a perfect trial. "[G]iven the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial," and the Constitution does not demand one. United States v. Hasting, 461 U.S. 499, 508 (1983) (internal citations omitted). Hence, cumulative error warrants habeas relief only if the errors have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Such "infection" occurs where the combined impact of the errors had a "substantial and injurious effect or influence on the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (internal quotations omitted). Moreover, only where the combined effect of errors renders a criminal defense "*far less persuasive* than it might [otherwise] have been," the resulting conviction violates due process, Chambers, 410 U.S. at 294, 302-03 (emphasis added), which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he/she demonstrates "actual prejudice." See Murray v. Carrier, 477 U.S. 478, 494 (1986); accord Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) (explaining that "actual prejudice" must be established by a showing that the errors during the trial created more than a hypothetical possibility of prejudice).

Here, Petitioners multiple submissions offer the Court only his hypotheses as to the prejudice he might have suffered. However, such hypotheses, no matter how numerous, cannot amount to a showing establishing actual prejudice.[27] Therefore, Petitioner is not entitled to a writ on the basis of his cumulative error challenges.

---

[27] A quantity-over-quality approach cannot meet the "actual prejudice" requirement. Accord Howard v. Sec'y, Fla. Dep't of Corr., 2009 U.S. Dist. LEXIS 102870, at *18 (M.D. Fla. Oct. 19, 2009) ("The United States Supreme Court

33

### b.        *Weight of the Evidence*

A claim that the verdict is against the weight of the evidence is essentially a matter of state law, and does not raise a federal constitutional question unless the record is completely devoid of evidentiary support, in violation of the criminal defendant's due process rights.  See Cunningham v. Maroney, 397 F.2d 724, 725 (3d Cir. 1968).  Thus, a claim that the jury's verdict was against the weight of the evidence raises a due process concern only where, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" should the writ issue.[28] Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Singer v. Court of Common Pleas, Bucks County, 879 F.2d 1203, 1206 (3d Cir. 1989).

Here, the State presented overwhelming evidence.  (See, generally, Docket Entries 12-1 to 12-2.)  Petitioner does not address the bulk of the State's case against him, but focuses on two pieces of physical evidence and two pieces of testimony, namely: (a) the ammunition and holster found in his apartment; and (b) the statements made by Roll and Imperatore.

Petitioner's position as to the ammunition and holster fails to show that the record is devoid of evidentiary support.  The jurors were justified in accepting the State's argument that Petitioner used the ammunition and holster for his gun, which he used to kill Richard, while rejecting Petitioner's position that John must have "planted" the ammunition in Petitioner's apartment after killing Richard and that Petitioner, somehow, kept the holster belonging to his acquaintance, a federal marshal, in Petitioner's apartment.

---

has not recognized cumulative error as a separate violation of the Constitution, or as a separate ground for habeas corpus relief.  See Lorraine v. Coyle, 291 F.3d 416 (6th Cir. 2002), amended on other grounds, 307 F.3d 459 (6th Cir. 2002).

[28]  Factual issues determined by a state court (jurors included) are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence.  See Werts v. Vaughn, 228 F.3d 178, 196 (3d Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)).

Petitioner's allegations based on the testimony of Roll and Imperatore are similarly flawed. With regard to Roll, Petitioner maintains that she cried to the jurors, "Mr. Gambino is a good man and could never have killed anybody."[29]  However, the record reflects that Roll testified about: (a) Petitioner telling her about his long vendetta with Richard; (b) Petitioner's repeated statements that he wished to kill Richard; (c) Petitioner's statement on the night of the murder that he "could not take it any more," with a clarification, "I shot him"; and (d) Roll's response that she believed Petitioner actually meant that he had killed Richard.  (See Docket Entry No. 12-5, at 82-90 and 92.)

As to Imperatore, Petitioner asserts that Imperatore's entire testimony was perjurious. However, Imperatore's testimony was both detailed and highly coherent.  Indeed, Imperatore testified that, on the night of the murder: (a) Petitioner told him that Petitioner "couldn't take it any more"; (b) Petitioner asked him to drive to the Hackensack River and showed him a gun, explaining that he wanted to get rid of it; (c) Petitioner confessed, stating, "I shot him.  I shot him and when he fell down I shot him in the back."  (Docket Entry No. 14-7, at 4-5.)  Imperatore testified that he concluded Petitioner must have been speaking about Richard.  (See id.)  Moreover, Imperatore testified that he, in fact, drove to the Hackensack River, where Petitioner got out of the car and went to the river, and – upon his return – said that he had thrown the gun "so far into the river that [police] would never find it."  (See id.)

Petitioner offered a different account of his meeting with Impertore, maintaining that they met late at night because Petitioner had an urge to share his excitement about a multi-million dollar business deal he was about to enter.  Despite Petitioner's account, the jury had a valid

---

[29]  The Court examined the record of Roll's testimony but could not locate the sentence Petitioner attributed to her. (See, generally, Docket Entry No. 12-5.)

basis to accept the State's version of events, as supported by, inter alia, Roll and Imperatore's testimony. Therefore, this Court cannot conclude that, after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found the essential elements of the crime of murder beyond a reasonable doubt. On this argument, Petitioner is not entitled to relief.

**V.   CERTIFICATE OF APPEALABILITY**

Having dismissed all Petitioner's claims and sub-claims on the merits, this Court must now determine whether a certificate of appealability should issue. See Third Circuit Local Appellate Rule 22.2. A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and "[a] petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims." Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). Here, Petitioner raised a multitude of claims, however, regardless of the volume and variety of his challenges, he failed to make a substantial showing of the denial of a constitutional right. This Court is persuaded that jurists of reason would not disagree with this Court's conclusions. Thus, no certificate of appealability will issue.

**VI.   CONCLUSION**

For the foregoing reasons, this Court dismisses the Petition and denies Petitioner a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. No certificate of appealability will issue, pursuant to 28 U.S.C. § 2253(c)(2). An appropriate Order accompanies this Opinion.


**S/SUSAN D. WIGENTON**
**United States District Judge**

36